Filed 6/10/13  In re Justin T. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JUSTIN T., et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> BRIAN T., <br><br> Defendant and Appellant. | F066056 <br><br> (Super. Ct. No. 10CEJ300146) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Brian M. Arax, Judge.

Elysa J. Perry, under appointment by the Court of Appeal, for Defendant and Appellant.

Kevin Briggs, County Counsel, and William G. Smith, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Brian T. (father) appeals from an order terminating parental rights to his five children. (Welf. & Inst. Code, § 366.26.)[1] Father contends the juvenile court's finding that the children were likely to be adopted was not supported by substantial evidence, and the juvenile court erred in declining to apply the beneficial parent-child relationship and sibling relationship exceptions to adoption. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Fresno County Department of Social Services (Department) in June 2010, after Tracy P. (mother) tested positive for methamphetamine at Hailey T.'s birth. Mother had used methamphetamine once or twice a month throughout the pregnancy and had no prenatal care. Hailey was removed from mother at the hospital.

Four days later, mother and father's four older children, Justin, Hannah, Thomas and Emma, were removed from their parents' care after they disclosed ongoing domestic violence between father and mother in their presence, which included yelling and cursing at each other, slamming doors and throwing and breaking objects. The children, who ranged from age seven to age one, said that father was living with them and mother, while both mother and father said he did not live there. Father had been on probation in the past due to domestic violence with mother and there was a restraining order for father to stay away from mother.

The Department alleged these facts in its petition as a basis for dependency jurisdiction under section 300, subdivision (b) (neglect), as mother's substance abuse and domestic violence between the parents put the children at risk of harm. All five children were detained and placed together in a foster home. Mother told the social worker she did not have any relatives or friends who could take the children.

---

[1] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise noted.

Before the children were detained, a social worker spoke with father at the family residence. Father did not know if mother had been using drugs, as he was not around her all the time. Father said he did not live there and was not around a lot. He wanted mother to raise the children. He said he did odd jobs here and there, and did not really have a place to stay. While the social worker was speaking with the older children individually, father left before the social worker could obtain his address. Thereafter, father had not made himself available to the Department to provide an address or telephone number, and the Department did not know his whereabouts. The Department, which considered father to be the children's presumed father, subsequently filed a declaration of due diligence with respect to father.

The children were in good health. Justin, Hannah and Thomas were developmentally on target and interacted with adults and children in age appropriate manners. Mental health assessments were given to Justin and Hannah; no treatment was recommended. Emma was referred to Central Valley Regional Center (CVRC) for an evaluation, as she had scored low in one developmental area in the fourteen month Ages and Stages Questionnaire (ASQ). Emma understood simple instructions and was able to perform age appropriate tasks; she also interacted with adults and children in an age appropriate manner. No relatives had come forward requesting placement of the children. The children had adjusted well to their foster home and appeared happy. The foster mother reported the children were all well behaved.

The juvenile court found the petition's allegations true after mother submitted on the social worker's report. Father did not appear at the jurisdictional hearing. At the August 26, 2010 uncontested dispositional hearing, the juvenile court adjudged the children dependents, removed them from mother's custody, and ordered reunification services for mother, but not father, as his whereabouts were unknown.

In a report prepared for the six-month review hearing, the Department recommended that mother's services be terminated, as she was not participating in

3.

therapy and there had been a domestic violence incident between her and father that resulted in father's arrest. According to mother, she went to the family's apartment on October 14, 2010, to pick up some belongings and ended up staying there with father. While living with him there, two domestic violence incidents occurred and father was arrested. Father was in the Fresno County jail. Mother's whereabouts were unknown to the Department from October 14 to December 2, 2010, and from December 7 through the writing of the report in March 2011.

Father had not visited the children since they were removed. He told a social worker he did not want to visit them because he was afraid he would be arrested at the Department, as there was a warrant out for his arrest. On March 16, 2011, father met with a social worker; he wanted to clear up his warrants while incarcerated at the Fresno County jail and wanted visits with his children. The social worker believed it would not be beneficial for the children to establish a relationship with father, as the Department was recommending they be assessed for a permanent plan, but if visits were to begin, they should be limited to once per month.

The children remained in the same foster home; they were well behaved and appeared happy. The care providers were willing to adopt the children if their parents failed to reunify. Justin was doing well in second grade, except in mathematics. Hannah was performing well in her first grade class and was satisfactory in all subject areas, with excellent behavior. Thomas was on target developmentally; he scored in the normal range of development in all domains on the 42 month ASQ-3. Emma had completed the CVRC assessment and she did not qualify for services. A 20-month ASQ was completed in February 2011; Emma scored in the normal range of development for all domains. A six-month ASQ was completed on Hailey, who scored in the normal range.

In an addendum report, the Department recommended that father be provided with reunification services. In April 2011, father told a social worker he wanted his children back and was willing to participate in services. On May 10, 2011, the social worker met

with father at the jail to discuss his status. Father said he was arrested on May 2, 2011, as he had a dirty drug test in April and did not participate in an anger management class as ordered by the probation department. He believed he was facing four years in prison.

At the six month review hearing on June 14, 2011, the juvenile court found mother's progress on her case plan was minimal and father had not made any progress. Mother's reunification services were terminated and reunification services were ordered for father. Father was given reasonable supervised visitation, but if father was sentenced to prison, his visits were to be quarterly.

In reports prepared for the 12-month review hearing, the social worker noted the children continued to do well in their placement. Justin and Hannah had completed their school years; the foster mother reported they both did very well academically and their behavior at school was appropriate. Thomas was going to enter preschool and would be receiving speech therapy through the elementary school for a speech delay. The foster parents had not reported any problems or concerns regarding the children, and remained committed to adopting them should their parents fail to reunify. The foster family agency reported that Justin, Hannah and Thomas had been referred to Youth Link for mental health assessments on February 18, 2011, but as of June 2011, Youth Link had not contacted the foster parents regarding the referrals.

Mother had not visited the children or contacted the Department since April 2011. Father did not visit the children from June 2010 until April 19, 2011. The social worker who observed a one hour visit with father on April 19 reported that only Justin and Hannah interacted with him, while Thomas played by himself most of the time. Emma and Hailey did not recognize father, although Emma did sit at a table with father and color. Subsequent visits did not occur due to father's incarceration. On June 8, 2011, the social worker sent father a letter inviting him to call her about services and visitation. Father responded and said he was interested in visiting with Hannah and Justin while incarcerated. The two visited father on June 24, 2011. A visit scheduled for July 1 was

5.

cancelled because father, who was sentenced to four years in prison on June 15, had been transported to Wasco State Prison. Since then, father had written the children letters, which the social worker reviewed and found appropriate. Justin, Hannah and Thomas were happy to receive mail from father.

The Department recommended that father's visits with Hannah and Justin remain quarterly, and visits with the other children be suspended. It also recommended termination of father's reunification services, as he was not able to participate in services due to his incarceration, and scheduling of a section 366.26 hearing. Father's expected release date was December 13, 2012.

At the August 18, 2011, 12-month review hearing, the juvenile court terminated father's reunification services over his objection and set a section 366.26 hearing for December 8, 2011. The juvenile court ordered quarterly supervised visits between father and all of the children while he was incarcerated at the Department of Corrections. Father, who appeared at the hearing in custody, asked for a visit to take place at the Fresno County jail before he was returned to prison.

The Department prepared a section 366.26 report for the December 8 hearing. Thomas was receiving twice weekly speech services because it was difficult to understand him. The foster parents stated that nine-year-old Justin, who was in the third grade, was disruptive in class and had a short attention span. Hannah, now seven years old and in the second grade, had good grades and was able to complete homework and class work without assistance. The social worker noted that Justin had some concerning behaviors that required a mental health assessment, as he was fascinated with fire and had been caught trying to play with lighters and electrical outlets. The social worker was going to schedule a visit for father when he was transported to the Fresno County jail for the December 8 hearing.

The social worker opined the children were generally adoptable due to their young ages. The foster parents' willingness to adopt, however, had been called into question.

6.

The foster mother was reconsidering adoption due to the recent death of her own mother, but the foster father wanted the adoption to proceed. The Department requested a 120-day continuance so the foster parents would have time to grieve the loss of their family member and come to an agreement between them before a decision on a permanent plan was made.

At the December 8 hearing, the juvenile court granted the Department's request for continuance and set a new section 366.26 hearing for April 5, 2012. Father's attorney asked that he get a visit with the children, as he had not had any visits since the August 18 hearing. The court ordered the Department to facilitate visits.

In an addendum report prepared for the April 5, 2012 hearing, the Department recommended another 120-day continuance so it could locate a risk-adopt home for the children. The social worker explained that the foster father told her on March 28, 2012, that he was no longer interested in adopting the children and he had informed their foster family agency of that intent. However, he was willing to work with the Department to identify a risk-adopt home and participate in their transition to an adoptive home. On April 4, the social worker was told the foster parents gave a seven-day notice as to the children and were in the process of moving into their adult daughter's home. The foster family agency social worker, Ms. Quintero, told the social worker the family gave her notice on March 28 during her scheduled visit with the family; this was one hour before the Department's social worker met with the foster father, who did not mention having given notice. When Quintero went back to the family's home on April 2, all the children's belongings were packed and the foster parents asked that they be moved by April 6.

With respect to visits with father, the social worker stated she was working with a transport driver to facilitate a visit. The driver found out father was permitted weekend visits and limited physical contact with the children at the Deuel Vocational Institution (DVI) in Tracy, where father was incarcerated. On April 4, the driver reported that father

was in the Fresno County jail; the social worker stated she would try to arrange a visit there.

At the April 5, 2012 hearing, which father attended in custody, the juvenile court ordered one visit locally before father was transported back to prison and reiterated the order of quarterly visits while father was in prison. The juvenile court continued the hearing to July 26, 2012.

In an addendum report prepared for the July 26 hearing, the Department recommended a 30-day continuance in order to locate a risk-adopt home for the children. The Department had been searching actively for an adoptive home that would accept all five children, as they had a significant bond that should be maintained. The children were placed together in the same licensed foster home on April 6, 2012. The foster mother's daughter initially wanted to be considered for a plan of adoption, but later changed her mind when her four-year-old son started having behavioral problems as a result of her increased contact with the children. The daughter, however, would consider adopting the youngest two children. The Department, in an effort to maintain the sibling relationship, did not want Emma and Hailey separated from their siblings. On July 23, the social worker spoke to an adoptive family on the telephone, who sent their home study to the Department because they were interested in being considered for adoption of all five children. The social worker scheduled a disclosure meeting with the family on July 30.

The Department wanted more time to search for a home that was willing to adopt all five children, as they had been together since their removal. The social worker stated the Department would make vigorous efforts to locate a home that was willing to adopt the children, as their removal from the foster home was not their fault and the Department did not want to cause the children further distress. The social worker noted the children had a strong relationship and bond that should be maintained. Once a home was identified, the Department would need a minimum of 30 days to transition the children to

the adoptive family, which would include day, overnight, and weekend visits. The Department's concurrent plan, should an adoptive home not be found, was a permanent planned living arrangement (PPLA). The social worker would assist with locating an adoptive home that would take all the children and, once one was identified and a relationship established between the children and the adoptive family, the Department would set another 366.26 hearing.

On June 18, 2012, the juvenile court ordered a mental health assessment and recommended treatment for Thomas, Emma and Hailey on the Department's ex parte application. The social worker explained that after the children were moved to the new care providers on April 6, Thomas and Emma became "very emotional." The social worker had seen Thomas and Emma in their prior home and they did not act that way there; they had always been happy, and received and accepted direction from their foster parents without incident. The social worker believed they were experiencing loss and grief. Hailey appeared to be "overly clingy" with the new care providers. Since there was no current court order for a mental health assessment for these children, the Department had requested permission to have them undergo an assessment and recommended treatment.

Foster family agency reports on the children revealed that Justin had a mental health assessment on January 30, 2012, and began weekly therapy on March 3. He was getting A's and B's in his third grade class, and received an outstanding for effort in physical education. Hannah was getting A's in her second grade class, doing well in school and was able to interact with her peers. Her mental health assessment was never completed. Thomas's speech was improving, as he spoke more clearly and was able to communicate his needs and wants.

After being placed in the new foster home on April 6, 2012, the foster family agency issued reports on the children. Justin was reported to be a healthy and smart boy. Hannah was described as a sweet, respectful and loving girl, who liked to draw and spend

9.

time with her siblings. She was going to be referred for a mental health assessment. The foster mother described Thomas as a sweet and loving boy. It appeared that Emma and Hailey had adjusted well to the new home and were developing bonds with the foster parent; they appeared very comfortable with them. The agency noted that Emma may have some speech delays, as her language was sometimes unintelligible, but she was a healthy toddler. Hailey was described as a bright and sweet child who was developmentally on track.

At the July 26, 2012 hearing, the juvenile court noted the Department's request for a continuance. The children's attorney spoke with the social worker the day before, who said there was a potential prospective adoptive family who may be interested in the children. The social worker wanted 30 days to see what might happen, but if not, the Department would proceed with a plan of long-term foster care. The children were with a care provider in her late 60's, who they called "Nana" or "Nanny." The children were well loved and well taken care of, but the care provider did not feel capable of maintaining all five children, although she was more than happy to keep them in the home. Father's attorney objected to the continuance, as it was beyond the 180 days to which the Department was entitled.

The juvenile court granted the continuance and directed the Department to file a supplemental report on adoptability. It set the section 366.26 hearing for August 30, 2012. Father's attorney stated that father had a visit in April; the children brought him cards and drew pictures. Father's attorney asked that another visit take place while father was in local custody. The court directed the Department to facilitate a visit with father.

On July 31, 2012, the juvenile court granted the Department's petition to administer psychotropic medication to Justin, who had been diagnosed with ADHD and enuresis. His symptoms included inattention, impulsivity, fidgety and disruptive behaviors, and difficulty following directions.

10.

In the addendum report prepared for the August 30 hearing, the Department recommended adoption with termination of parental rights. The social worker reported that she supervised a visit at the jail between father and the children on April 6, 2012. Father did not recognize Hailey and Emma, and they did not recognize father. The social worker had to knock on the glass window and tell him they were his daughters. Father got on the phone and told them that he did not recognize them because they had grown so big. Emma was talking, but it was difficult to understand her. Emma appeared scared and would not look directly at father. Hailey did not want to touch the phone or pick it up. After five minutes, they were ready to end the visit. Emma put down the phone, said "bye" and started to walk away.

The social worker then took Thomas and Hannah in to see father. Hannah appeared happy and immediately recognized father. She showed him the picture she drew for him. Thomas talked on the phone a little, but did not appear too interested in talking to father as evident by him passing the phone to Hannah. Thomas did not want to talk on the phone, even after Hannah told him to "take the phone it's daddy." Thomas continued to play with his action toy figure as Hannah talked to father. The social worker then brought Justin in, who appeared excited to see father. None of the children cried upon leaving the jail or asked for another visit. Emma and Hailey appeared overwhelmed and fell asleep at the jail while the other children were visiting.

The social worker also supervised a visit at the jail on July 31, 2012. Hannah and Justin went in first; they asked father questions, which he answered. Hannah made reference to her therapist. Father stated, "What are you in therapy for, you're not crazy." When Hannah stated Justin was also in therapy, father stated there was nothing wrong with him and asked "You crazy boy?" Justin stated no, and handed the phone to Hannah. Father asked Hannah if she was taking care of her siblings; she said she was. The social worker brought Hailey and Emma in to visit. Emma did not want to pick up the phone, while Hailey stood by the social worker and looked like she was going to cry. The social

11.

worker picked Hailey up; she would not look at father. Father agreed with the social worker that the two appeared scared and asked if Hannah could come back in with Thomas. When the social worker brought Emma and Hannah to the care provider in the lobby, Hailey immediately reached for her and Emma wrapped her arms around the care provider's leg.

The social worker returned with Thomas and Hannah. Thomas picked up the phone and said "hi." Thomas started singing and making silly noises on the phone. Father asked him to give Hannah the phone. Thomas did not want to let go of the phone and kept making noises. Father asked the social worker if Thomas was seeing a therapist. The social worker responded that he was scheduled for a mental health assessment. Father tried to talk to Thomas again, but he kept making noises. Hannah got on the phone; father asked her what was "wrong with that boy." Hannah did not know. Father told Hannah he was going to try to get them back after he was released from jail. The social worker told father not to discuss the case with the children. Father appeared agitated and said "whatever." Thomas appeared bored while father was talking to Hannah; he started to walk away and tried to climb up the wall. Thomas refused to get on the phone to say goodbye.

Justin continued in therapy. Hannah completed a mental health assessment on July 23, 2012, which was ordered due to increased sadness and crying; it was determined that mental health services were warranted and she was being seen once per week. Thomas completed a mental health assessment on July 17, 2012; it was determined mental health services were warranted. He attended his first appointment on August 29, 2012. Emma's mental health assessment was rescheduled to September 14, 2012. Hailey completed a mental health assessment on August 28; it was determined that she did not warrant services at that time.

On August 14, 2012, a disclosure meeting was held with the potential risk-adopt family who was interested in adopting the children. The family was provided with

12.

information about the children's medical, developmental, educational and behavioral needs. The Department discussed the importance of allowing the older children to maintain their school placement, as it had been a consistent factor in their lives. The next day, the family stated they wanted to meet the children. A meet and greet visit was held at the Department's office on August 23. The family showed excellent ability to engage Justin, Hannah and Thomas. It was difficult to provide the same engagement with Emma and Hailey, as the older children required more attention with the activity. The Department had arranged to supervise another visit in the family's home to observe their ability to provide care and supervision to their three biological children and the five children. If the visit was successful, the Department would develop a transition plan consisting of unsupervised, overnight and liberal visits when appropriate. Social workers attempted to locate family members who would be interested in adopting the children, but were unsuccessful.

The social worker believed father did not understand that the children had negative experiences when they were removed from his care and while in foster care. He also did not understand therapy and its benefits to the children. The social worker did not believe that continuing visits with father was appropriate due to Emma and Hailey's negative reactions, father's comment to Thomas about "being crazy" and his giving Hannah false hope that she would return to his care. The Department requested that visits be suspended until therapeutically advised. The social worker opined the children were generally adoptable as they were young, physically healthy, and able to form positive attachments.

At the August 30 hearing, father requested a contested hearing. Father subsequently filed an issue statement stating he was contesting the following: (1) the Department's opinion that the children are generally adoptable, and (2) whether he had a strong parent/child relationship with the children that, if severed, would cause them great harm. On September 11, County counsel stated the Department was submitting on its

13.

reports and that, according to the social worker, the potential placement was progressing well, with another visit scheduled. County counsel added it was unusual to find a family willing to adopt five siblings, but confirmed the Department was prepared to go forward on the 366.26 with a recommendation of adoption. Father's attorney wanted to confirm the matter for trial.

At the September 20 section 366.26 hearing, the social worker in the adoptions assessment unit testified that she considered the children to be a sibling group, as they had significant relationships with each other that the Department wanted to maintain. The social worker supervised a visit with the prospective adoptive family in their home; all of the children were present with the exception of Emma, who was sick. The visit went very well. The prospective adoptive parents were attentive to the children's needs and had various activities for them. The Department was moving forward with a transition plan which would result in the children being placed full time in the home by the end of November or beginning of December.

The social worker had determined the children were adoptable as they were physically healthy and able to form positive, healthy attachments. The social worker recognized there were "minor behavior concerns," but they were being addressed in therapy. The children were not strangers to the prospective adoptive family; the family attended the same church as the foster parent's daughter, who sometimes brought the children to the church. The prospective adoptive mother teaches Sunday school at the church and first met the children in April 2012. She was very interested in knowing what was going on with them and when she found out they were available for adoption, she immediately asked her agency to submit their home study. The social worker did not know of any reason the adoption with the family would not be completed.

The social worker acknowledged that it can be difficult to find a family willing to adopt five children. A lot of families were interested in adopting Emma and Hailey, but not the older three. The social worker also acknowledged that sometimes after a family

spends more time with the children, either the family or the children will decide not to proceed with the adoption. The prospective adoptive family had spent a total of three hours with the children on August 23 and September 11. Thereafter, Emma and Hailey had been visiting daily, and all five had been there the weekend of September 15 and 16. The social worker believed the transition plan would allow the family to develop a closer relationship with the children. In addition, the family had told her they had decided to move forward with the adoption based on their interactions with the children at church, which had allowed them to know a lot about the children's needs, including Thomas's speech and Justin's behaviors.

The social worker opined the children did not have a significant bond with father and did not have a parent/child relationship with him. While she believed Justin and Hannah were familiar with father, and Thomas knew who he was, Emma and Hailey did not have a relationship with him at all. The social worker believed that any relationship the children had with father did not outweigh the relationships they would gain from adoption.

Father testified he did not agree with the social worker's assessment that he did not have a bond with the children. According to father, they had been a "real tight knit family their whole life," with the exception of "the small one Hailey." Father testified he had a strong bond with all of the children. Although he acknowledged Hailey hardly knew him, he thought she had a relationship with him because of "her sister." He also believed the children would be harmed if his relationship with them were severed. He believed Justin would be harmed because he needed a lot of attention, Thomas would be harmed because he would think he did not have to listen to his new parents as they were not his biological parents, and Hannah would be harmed because she would act out since she would know she was not with her biological parents.

Since his incarceration, he had written each of the children once a month. The children gave him cards at the April 2012 visit, which said that they loved and missed

15.

him. Father said the children told him during the visit that they loved and missed him. Father claimed he was joking around with Justin when he asked him about therapy and whether he was crazy.

Father admitted that when the children were removed from the home he did not "step right up" to the Department to get them back because he had a warrant for domestic violence. Father said he was arrested in August 2010, and spent five and a half months in jail, until he was released due to overcrowding. He was out of jail 40 days; during that time he visited the children at the Department. When he returned to court, he was remanded and sentenced to state prison in June 2011. His tentative release date was November 15, 2012.

After father testified, the social worker was recalled and asked if there was anything in father's testimony that would cause her to change her recommendation to terminate parental rights. She responded, "No."

After hearing oral argument, the juvenile court issued its decision. The court found the children generally adoptable as individuals by clear and convincing evidence. While the court recognized that Justin had some behavioral issues, they were being addressed in therapy and the court did not consider them to be an impediment to adoption. The court further noted that neither foster family had indicated the children's behaviors were a significant concern or could not be managed. The court noted that although the sibling relationship exception to adoption had not been litigated at this hearing, it had no evidence before it that the children would suffer detriment if they were split up or that the exception applied. With respect to the beneficial relationship exception, the court found that while father did not have regular and consistent contact with the children, due mostly to his incarceration, he had tried to maintain contact with them and loved them. The court, however, found that father did not have a parental relationship with the children and therefore found the exception did not apply. Accordingly, the court terminated parental rights and placed the children for adoption.

16.

## DISCUSSION

*Adoptability*

Father first challenges the juvenile court's finding that the children were adoptable. Both the evidentiary standard that applies to this issue in the juvenile court and our standard of review on appeal are well settled. At a section 366.26 hearing, the court must determine by clear and convincing evidence whether it is likely the minor will be adopted. (§ 366.26, subd. (c)(1).) If the court finds a likelihood of adoption, the court *must* terminate parental rights, unless one of the statutory exceptions to adoption exists. (*In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*) [if evidence at section 366.26 hearing shows child is likely to be adopted, juvenile court "must order adoption and its necessary consequence, termination of parental rights, unless one of the [statutorily] specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child."]; *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320 (*A.A.*).)

"Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time. [Citations.] We review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion. It is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.) In other words, on appeal, "the clear and convincing test disappears and 'the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526 (*I.W.*).) Moreover, we review the record in the light most favorable to the juvenile court's findings, and draw all inferences from the evidence that support the court's determination. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177.)

"The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age, physical condition, and emotional state make it difficult to find a person willing to adopt." (*A.A., supra,* 167 Cal.App.4th at p. 1311.) "It is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citation.] [¶] Conversely, the existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child. In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*A.A., supra,* 167 Cal.App.4th at pp. 1311–1312.)

Having reviewed the record as summarized above, we conclude there was substantial evidence to support the juvenile court's adoptability finding. The children were physically healthy with no developmental delays. None of the children received services from CVRC. Justin and Hannah were doing well in school. Justin was described as healthy and smart, while the other children were described as sweet or loving. The children were able to form positive attachments to their caregivers, as shown by statements in the foster family agency's reports that the first foster family treated the children as family members and they were included in all family activities and events, where they were receiving security, support and love. After they were transferred to the second foster home, the children developed bonds with that care giver, as shown by Emma and Hailey seeking comfort from the care provider after their July 31, 2012, visit with father, and that the children called her "Nana" or "Nanny."

While some of the children had speech, behavior or emotional problems that required intervention, those problems were all being addressed and the children were improving. Thomas's speech problem, which made it difficult to understand him, was

18.

improving through speech therapy. Justin was receiving therapy for ADHD, for which he was taking psychotropic medication, and his fascination with fire, but despite his problems, he was able to maintain good grades in school, and even received an "outstanding" for his effort in physical education. Hannah and Thomas were also in therapy, which became necessary only after they were removed from the first foster home after living there for nearly two years. There is nothing in the record to suggest that any of the children's problems were so severe that it would make it difficult to find someone to adopt them. To the contrary, the first foster family was committed to adoption until they backed out for personal reasons, and the second foster mother found the children to be happy and loving.

Finally, two sets of caregivers had been interested in adopting the children. Although the first foster family backed out of the adoption for reasons other than the children's behavior or that there were five of them, until that occurred they remained committed to adopting the children despite their number or any behavioral problems they had. While the children had not yet been placed with the second prospective adoptive family, the family was aware of the children's needs through interacting with them at church and the Department providing them with information about the children's issues, and remained interested in adopting them. Although visits with the family had just begun, there were no reported problems with the visits that had occurred.

Given the children's positive attributes, the progress they were making in overcoming their problems, as well as the former caregivers' willingness to adopt them and the interest shown by the prospective adoptive family, the juvenile court properly could find it was likely the children would be adopted. (§ 366.26, subd. (c)(1).)

Father contends the evidence was insufficient to support the juvenile court's adoptability finding because the children were members of a large and bonded sibling group who should not be separated, and no prospective adoptive home had been approved that would take all of the children. While membership in a sibling group is a potential

19.

barrier to adoptability (§ 366.26, subd. (c)(1)(B)(v)), this did not prevent the Department from identifying at least one potential adoptive family. The social worker admitted it can be difficult to locate a family willing to adopt five children, but it certainly was not impossible. Notably, a family who was interested in the five children appeared within four months of the Department learning at the end of March 2012 that the first family had decided not to proceed with the adoption.

Moreover, the juvenile court, in making its adoptability finding, contemplated that the sibling group could be split up, noting that while it hoped the children would remain together and it would be in their best interest to do so, there was no evidence before it that placing the children in different adoptive homes was "so overwhelmingly bad that would overcome the preference for adoption." As father states, the social worker opined that the children had a significant bond that should be maintained. No evidence was presented, however, on whether the children would suffer detriment if they were adopted by different families, or that the benefit from maintaining a relationship with each other would outweigh the benefit they would receive through adoption. (See *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-953 (*L.Y.L.*) [when deciding to apply sibling relationship exception to adoption, court must consider whether terminating parental rights would interfere substantially with the sibling relationship and, if so, whether the child's best interest in continuing that relationship outweighs the benefit the child would receive by the permanency of adoption].) Absent evidence that the children would gain more from their sibling relationships than from adoption, the juvenile court reasonably could find, as it did, that the children were generally adoptable regardless of whether they were placed in one adoptive home or in separate homes.

Father also asserts the adoptability finding was based on the latest family's commitment to adoption, which was far from certain. Contrary to father's assertion, the juvenile court based its adoptability finding, not on the family's interest in adopting, but on the children's characteristics. The juvenile court specifically noted that, while the

20.

family's interest in adoption was "some evidence" that the children both would be adopted as a unit and were generally adoptable, it did not find that evidence overwhelming or strong, and it believed the children were generally adoptable "beyond a shadow of a doubt." For this reason, whether there is a legal impediment to adoption, which father contends exists due to the absence of a preliminary assessment of the family, is irrelevant. (See, *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061 [". . . where the child is deemed adoptable based solely on the fact that a particular family is willing to adopt him or her, the trial court must determine whether there is a legal impediment to adoption."].) Moreover, father is mistaken that there is no evidence the family was approved to adopt all five children; the family had a home study, which was sent to the Department, and the social worker testified she saw no reason why the adoption would not go through.

Finally, father asserts that "[l]egal orphanage is a consequence the law abhors." Freeing the children for adoption, however, carries little risk that they will become legal orphans, as a child may file a section 388 petition to set aside an order terminating parental rights where the child is not adopted within three years, the trial court determines the child is no longer likely to be adopted, and reinstatement of parental rights is in the child's best interest. (§ 366.26, subd. (i)(3); Cal. Juvenile Dependency Practice (Cont.Ed.Bar 2011) § 8.50, p. 666.)

Father essentially asks this court to reweigh the evidence and draw questionable inferences on conflicting evidence. This, however, is not within our appellate purview. Our power is limited to determining whether there is evidence which will support the trier of fact's conclusion. All conflicts must be resolved in respondent's favor and all legitimate inferences indulged in to uphold the decision, if possible. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378-1379.) On this record, we conclude there was substantial evidence to support the juvenile court's finding.

21.

*The Children's Wishes*

According to section 366.26, subdivision (h) and *In re Juan H.* (1992) 11 Cal.App.4th 169, the juvenile court shall "consider the wishes of the child" to the extent ascertainable in all section 366.26 termination proceedings. To that end, the code also requires that an assessment prepared for a section 366.26 hearing include a "statement from the child concerning placement and the adoption or guardianship, … unless the child's age or physical, emotional or other condition precluded his or her meaningful response, and if so, a description of the condition." (§§ 366.21, subd. (i)(1)(E), 366.22, subd. (c)(1)(E).) Further, section 317, subdivision (e) regarding the responsibilities of a dependent child's counsel, states if the child is four years of age or older, counsel shall interview the child to determine the child's wishes and to assess the child's well-being, and shall advise the court of the child's wishes.

Father contends the juvenile court failed to consider the children's wishes before terminating parental rights. Specifically, father asserts that it was impossible for the court to comply with its mandatory duty to consider the children's wishes because there was no evidence in the social worker's reports or testimony at the hearing regarding those wishes. Absent this evidence, father urges us to reverse.

We agree with father that the Department's reports did not include any statements from the children and the children's counsel did not advise the court of her two, three, five, eight and nine-year-old clients' wishes. We certainly do not condone the lax effort by the Department in this regard. The code does not impose a difficult requirement; it merely requires a statement from the child or a description of the condition preventing such a statement. At least in the case of the two youngest girls, Emma and Hailey, the court properly could have inferred they were too young to give a meaningful statement or otherwise express their wishes. As for the children's counsel's obligation under section 317, we cannot say on this record that she failed to interview her young clients or that counsel, in joining in the Department's recommendation, argued against her clients'

22.

wishes.  (*Calhoun v. Hildebrandt* (1964) 230 Cal.App.2d 70, 72 [appellant has a burden to affirmatively show error on the record].)  Still, counsel did fail to comply with her statutory duty to report to the court the children's wishes.  Nonetheless, as discussed below, we disagree that reversal is required.

We begin by observing, as the Department does, that father raises these complaints for the first time on appeal.  Certainly, there was nothing to prevent father from either objecting to or otherwise questioning the purported evidentiary insufficiency or offering his own evidence on the subject if he believed the children's wishes conflicted with the Department's recommendations.  Arguably, father has forfeited his complaints over the lack of evidence by his failure to object below.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338-1339 (*Lorenzo C.*).)  Even were we to conclude father did not forfeit his challenge at least to the court's consideration, we are not persuaded that the court erred or, in any event, that reversal is warranted.

Insofar as father claims the court failed to consider the children's wishes before terminating parental rights, we disagree.  The juvenile court's obligation under section 366. 26, subdivision (h) to consider the wishes of the child does not require direct evidence of the child's wishes or of the child's awareness that the proceeding is a termination action for purposes of assessing the child's preferences.  (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1592 (*Leo M.*).)  Instead, where practicable and consistent with the best interests of the child, the department should attempt to obtain some evidence of the child's feelings from which the court can then infer the child's wishes regarding the issue confronting the court.  (*Ibid.*)  In the absence of evidence to the contrary, we will presume the court has performed its statutory obligation (Evid. Code, § 664) on behalf of the child.  (*Leo M., supra,* 19 Cal.App.4th at p. 1594.)

On review of the record, we find sufficient evidence to conclude the court could reasonably ascertain the children's wishes.  As shown in the social worker's reports, the children had little connection with their father.  Emma and Hailey did not recognize him.

While Thomas recognized father, during visits his attention was focused on his toys and he showed little interest in interacting with father. None of the children, including Justin and Hannah, were upset when visits ended and did not ask to see father. The Department reported the children had developed emotional attachments, and a sense of security and love, with their first foster family. The children had an apparent positive connection to their second foster mother, calling her "Nana" or "Nanny." While evidence of the children's feelings was slim, we conclude there was enough evidence from which the juvenile court could infer their feelings.

Finally, even assuming there was error, father fails to show that reversal is warranted. While the law requires the court to consider a child's wishes to the extent ascertainable, it does not command the court to abide by those wishes unless the child is 12 years of age or older and objects to the termination of parental rights. (§ 366.26, subd. (c)(1)(B)(ii).) He offers no persuasive argument that the error resulted in a miscarriage of justice so that it is reasonably probable a different result would have occurred in the absence of the purported error. (Cal. Const., art. VI, § 13; *Celine R.*, *supra*, 31 Cal.4th at pp. 59-60.)

*The Exceptions to Adoption*

Father contends if there is a likelihood of adoption, termination of his parental rights would be detrimental to the children under two statutory exceptions to adoption: (1) section 366.26, subdivision (c)(1)(B)(i), based on his regular visitation and contact with the children, and their bond with him; and (2) section 366.26, subdivision (c)(1)(B)(v), based on substantial interference with their sibling relationships. Here, the juvenile court declined to apply either exception.

There is a split of authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*) and *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [hybrid combination of substantial evidence and abuse of discretion standards; applying substantial evidence test to determination of the existence

24.

of a beneficial sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining that termination would be detrimental to the child]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*) [substantial evidence test—"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order"]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [abuse of discretion test].) Father inconsistently asserts the substantial evidence standard of review applies to our review of the beneficial parental relationship exception, but recognizes the split of authority as to review of the sibling relationship exception, while the Department asserts review is for abuse of discretion.

Our conclusion in this case would be the same under any of these standards because the practical differences between the standards are "not significant," as they all give deference to the juvenile court's judgment. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find [s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' . . .""" (*Id.* at p. 1351.) Moreover, a substantial evidence challenge to the juvenile court's failure to find a beneficial parental relationship or a sibling relationship cannot succeed unless the undisputed facts establish the existence of those relationships, since such a challenge amounts to a contention that the "undisputed facts lead to only one conclusion." (*I.W., supra,* 180 Cal.App.4th at p. 1529; *Bailey J., supra,* 189 Cal.App.4th at p. 1314.)

Once the court determines a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental under one of the statutory exceptions. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809 (*Zachary G.*).)

We begin with the parent-child relationship exception. To avoid termination of parental rights under the parent-child relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstance that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The Court of Appeal in *Autumn H.* defined a beneficial parent/child relationship as one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent must show more than frequent and loving contact or pleasant visits for the exception to apply. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *I.W., supra,* 180 Cal.App.4th at p. 1527.) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated." (*In re C.F., supra,* at p. 555.)

In this case, the juvenile court found that while father did everything he could before the children were removed to establish and maintain a bond with the children, and he did his best to maintain contact with them after their removal, the relationship the children had with him did not promote their wellbeing to such a degree that it outweighed

the wellbeing they would gain in a permanent home with new adoptive parents. In so finding, the court noted the following: father had difficulty being around the children for significant periods of time even before removal because of the on again/off again nature of his relationship with mother and domestic violence; father's incarceration; the children's behaviors during visits and the lack of difficulty ending them; and father's behavior during visits. Accordingly, the court found the beneficial relationship exception did not apply.

Father asserts the juvenile court erred in so finding, citing to his testimony that he (1) cared for Justin, Hannah, Thomas and Emma for the majority of their lives and, after his incarceration, wrote monthly letters to the children; (2) always had a bond with the children; and (3) believed they would be harmed if his relationship with them were severed. Father further asserts that because the three older children had a bond with him, and all of the children needed to be placed together, his parental rights to all of them should not be terminated.

Father, however, ignores the other evidence that supports the juvenile court's decision. Even assuming father maintained regular visits and contacts with the children, there is no evidence that the children had a substantial, positive emotional attachment to father, let alone that they would be greatly harmed if their relationships were severed. (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1342.) On this record, we cannot say that no judge reasonably could have made the decision made here, or that the undisputed facts lead to only one conclusion.

Turning to the sibling relationship exception, father contends adoption will substantially interfere with the relationships between the children because separating them would cause them trauma, and their relationships with each other promoted their wellbeing to such a degree that those relationships outweighed any wellbeing they would gain in an adoptive home. Father claims the juvenile court did not conduct this balancing test, and instead assumed the children would be placed together.

27.

Section 366.26, subdivision (c)(1)(B)(v) permits a finding of detriment in situations where termination would cause a substantial interference with the sibling relationship. If termination would substantially interfere with the sibling relationship, section 366.26, subdivision (c)(1)(B)(v) lists numerous factors the juvenile court should consider in determining whether the circumstances of any given case warrant the application of the exception. First, a juvenile court must consider the nature and extent of the relationship, including, but not limited to, factors such as 1) whether the child was raised with a sibling in the same home, 2) whether the child shared significant common experiences, or 3) whether the child has existing close and strong bonds with a sibling. If the relationship exhibits some or all of these factors, the juvenile court must then go on to balance any benefit, emotional or otherwise, the child would obtain from ongoing contact with the sibling against the benefit of legal permanence the child would obtain through adoption. (§ 366.26, subd. (c)(1)(B)(v); see *L.Y.L., supra,* 101 Cal.App.4th at p. 949.) This statutory exception merely permits a court, in *exceptional circumstances,* to exercise its discretion and choose an option other than the norm, which remains adoption. (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

Contrary to father's assertion, even though he did not argue below that the sibling relationship exception applied, the juvenile court did consider the application of the exception and found there was no evidence before it that placing the children in different adoptive homes would be so detrimental as to overcome the preference for adoption. As we have already explained, while the social worker did opine that the children had a significant bond that should be maintained, no evidence was presented on whether the children would suffer detriment if they were adopted by different families, or that the benefit from maintaining a relationship with each other would outweigh the benefit they would receive through adoption. (See *L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 951-953.) It was father's burden to present such evidence. Absent evidence that the children would gain more from their sibling relationships than from adoption, we cannot say that no

28.

judge reasonably could have found that father failed to prove the benefits of maintaining sibling relationships outweighed the benefits of adoption; neither can we say the undisputed facts lead to only one conclusion.

## **DISPOSITION**

The order terminating parental rights is affirmed.


_____

Gomes, J.

WE CONCUR:


_____

Levy, Acting P.J.


_____

Cornell, J.